1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DAMIAN ALCANTARA,

11            Petitioner,            No. 2:05-cv-1700 FCD KJN P

12        vs.

13   THOMAS FELKER, Warden,

14            Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17            Petitioner is a state prisoner proceeding without counsel with an application for a

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2002 conviction on

19   charges of second degree murder and street terrorism.  (Clerk's Transcript ("CT") 1171, 1173.)

20   Petitioner was sentenced to 15 years to life in state prison.  Petitioner raises five claims in his

21   petition, filed July 25, 2005, that his prison sentence violates the Constitution.

22   II.  Procedural History

23            Petitioner filed a timely appeal to the Court of Appeal of the State of California,

24   Third Appellate District.  (Respondent's Lodged Document ("LD") Nos. 1- 3.)  The Court of

25   Appeal affirmed petitioner's conviction by order filed June 29, 2004.  (LD 4.)  Petitioner filed a

26   petition for rehearing.  (LD 5.)  On July 23, 2004, the Court of Appeal modified the prior opinion

1

1  without changing the result.  (LD 6.)

2         On August 10, 2004, petitioner filed a petition for review in the California

3  Supreme Court.  (LD 7.)  The petition was denied on September 29, 2004.  (LD 8.)

4         On July 25, 2005, petitioner filed the instant petition.

5  III.  Facts and Procedural Background[1]

6                                    I
                             The Information

7

8         By information, the People charged Javier Juarez Sanchez and
   defendants Alcantara and Fisher with murder (§ 187).  The
   information alleged sentence enhancements against all three for

9  street terrorism (§ 186.22, subd. (b)(1)) and against Fisher for the
   personal use of a knife (§ 12022, subd. (b)(1)).  The information

10 further charged all three with street terrorism (§ 186.22, subd. (a)).

11        Prior to trial, Sanchez pled guilty to being an accessory to murder
   in exchange for a sentence of three years in state prison.  As part of

12 his plea agreement, Sanchez agreed to testify truthfully at trial.

13                                   II
                            The People's Case

14

15        At trial, Fisher's father, James Fisher, testified his son was at
   home most of the day on December 2, 2001, and that defendant
   Fisher had been drinking that day.  Late in the afternoon, defendant

16 Fisher's friends, Sanchez and Alcantara, came over to visit.  While
   they were there, James Fisher refused defendant Fisher's entreaty to

17 buy beer.  A short time later--at 4:00 or 5:00 p.m.--the three men
   emerged from defendant Fisher's room, said they were going to

18 Lodi to buy beer, and left.

19        On the date of his death, Carlos Ramirez lived with some friends
   on Locust Street.  He was 5 feet 10 inches tall and weighed 200

20 pounds.  He was not associated with any gang.

21        That night, Carlos Ramirez and his friend Rafael Delgado walked
   a few blocks to the local Beacon gas station to buy some sodas.

22 While Carlos Ramirez and Delgado were in the store, a small black
   or blue pickup drove by the station.  The people in the pickup were

23

24        [1] The facts are taken from the opinion of the California Court of Appeal for the Third
   Appellate District in People v. Fisher, et al., No. C042273 (June 29, 2004), a copy of which was

25 lodged by respondent as LD 4 on February 14, 2006.  All quotations from this opinion have been
   modified to include the changes ordered by the California Court of Appeal in its July 23, 2004

26 Order Modifying Opinion.  (LD 6.)

throwing gang signs at customers at the station. They were also throwing rocks. The cashier at the gas station testified the driver of the pickup was Mexican and had a passenger. She could not tell if there was a third person in the vehicle.

After Delgado and Carlos Ramirez left the store to go back home, Delgado was walking about 15 feet ahead of Carlos Ramirez. Delgado heard someone shout the words "Norte catorce, North 14." (The Norteño street gang uses the number 14 as one of its call signs.) When he heard the shout, Delgado turned around and saw two men beating up Carlos Ramirez who cried out for help. Delgado saw what looked like sparks coming from the fight and heard two or three "crack" noises. Delgado could not see the faces of the assailants. Delgado ran home.

At the time of the homicide, Cody Meyers was filling up his truck at the Beacon gas station across the street. Meyers heard someone running and looked up. He saw three guys beating up a fourth man. Meyers also heard a noise that sounded like a cattle prod. He described the sound to the police as sounding like a taser or stun gun.

Meyers saw that the victim was protecting his face with his arms and screaming in pain. When the victim fell to the ground, two of the men ran away in one direction and the third fled in a different direction. Meyers testified the entire attack happened very quickly--in about 10 seconds. Meyers could not describe the attackers, but testified the victim was larger than his attackers.

Lodi Police Officer David Griffin responded to the scene of the attack. He arrived at about 9:40 p.m. When Officer Griffin checked the victim's pulse and breath, he heard a gasping breath. Other than that, the victim was unresponsive.

When the paramedics arrived, they found Carlos Ramirez lying on the ground face up in a large pool of blood. He was dead. He had a large gaping wound in his neck. Carlos Ramirez also had several other stab wounds and cuts on his face, head, neck, and hands. All told, he had two slash wounds and six stab wounds.

The stab wound to his neck severed the jugular vein, went into his backbone, severed the spinal cord, and paralyzed him. This wound was the cause of death. The pathologist who conducted the autopsy believed that two bruises on Carlos Ramirez's chest were consistent with the use of a stun gun. Carlos Ramirez also had methamphetamine in his bloodstream, which may have lessened his sensitivity to pain.

When Delgado returned to the scene, he spoke with the police. He told the officers he saw sparks coming from Carlos Ramirez's chest and that he was screaming in pain.

The People's "star witness" was Sanchez.  Sanchez testified that he and both defendants were part of the Norteño gang.  Fisher was one of the gang members who "jumped" Sanchez into the South Side Lodi set of that gang.[2]  Alcantara was a member of a different set--the South Central Lodi set.

The day of the murder, Sanchez and his friend Donnie went to the Beacon gas station to buy beer.  Later, Sanchez and Alcantara drove to Fisher's house in Thornton.  All three men were drinking that night.  The three stayed at Fisher's house for one-half hour then drove back to Lodi.

Sanchez drove defendants Fisher and Alcantara to the Beacon gas station on the night of the murder in his dark blue Chevy truck.  They were looking for "someone to fight" from the rival Sureño gang.[3]  Alcantara told Sanchez that he had a stun gun and wanted to use it on someone.  While the men were driving around, Alcantara threw rocks or an empty beer can at a moving car in front of the Beacon gas station.

The three happened upon Carlos Ramirez and Delgado coming out of the gas station.  Alcantara told the others he recognized Carlos Ramirez as a Sureño gang member.  Sanchez pulled over and parked the pickup a few houses down from the Beacon station.  The two defendants jumped out of the pickup and went across the street and started fighting with the victim.  Alcantara used the stun gun on him. Delgado ran away.

According to Sanchez, Carlos Ramirez did not make any aggressive movements toward the defendants, but he did swing at them.  Sanchez did not believe the defendants intended to kill the victim.  When Carlos Ramirez fell down, the two defendants ran back to the truck.

Alcantara cut his thumb during the fight.  Sanchez identified a scar on Alcantara's thumb for the jury as being in the location of the cut.[4]  Sanchez drove away with the defendants in his pickup, dropped them off 5 to 10 minutes later at a nearby house, and left.

---

[2]  In order to join a gang, members are "jumped in."  This means they are beaten up by other members of the gang.

[3]  Prior to this incident, a Norteño gang member, Johnny Moreno, had been killed by a Sureño.

[4]  Sanchez did not impart this information to the police when they interviewed him after the incident.  He further admitted he knew Alcantara had surgery on his thumb from a prior wrestling injury.

4

Sanchez claimed he did not use Fisher's cellular telephone that night and did not see either of the two defendants use it.

Sanchez testified there was blood in his pickup and he took the upholstery out to clean the blood.  He also told officers he took the pickup to Sacramento within a few days after the murder and that he had removed the carpet, the seats or seat coverings, and the headliner.  When the officers examined the pickup, they found that the carpet had been removed and the seats did not match the make or year of the pickup.  The police were unable to find any blood inside the pickup.

Fisher's mother testified she awoke at about 10:45 p.m. and found her son rummaging around in her room for a flashlight.  At the preliminary hearing, she testified that her son woke her at about 3:00 in the morning.  She heard the dryer running from a load of laundry that included her son's jacket.  The next morning, she discovered Fisher had thrown away his shoes the previous night.  Fisher's mother confirmed that her son was once a Norteño gang member.

Another witness heard Fisher's mother telling a coworker that her son had acted strangely the night of the homicide.  He had come home late, washed his clothes, and buried some things in the backyard that night.[5]

Alcantara's girlfriend is Regina Ramirez.  Steven Estaban Ramirez is Regina Ramirez's cousin.  Steven Estaban Ramirez was also a member of the Norteño gang and friends with both the defendants and Sanchez.  He claimed he got out of that gang when he turned 18.

Shawna Hughes is Steven Estaban Ramirez's wife.  She testified she received a telephone call from Fisher the night of the homicide.  Fisher asked for Steven Estaban Ramirez, but Steven Estaban Ramirez was not available.

The records from Fisher's cellular telephone show that the telephone was used to call the home of Steven Estaban Ramirez at 9:45 p.m. the night of the murder.  That call lasted 36 seconds.  One minute later, the telephone was used to call Shawna Hughes, Steven Estaban Ramirez's wife.  That call lasted one minute and 15 seconds. In the next 15 minutes, two more telephone calls were placed to Shawna Hughes's number.  At 9:59 p.m., someone dialed Fisher's number into the phone and then punched in the numbers "13*187."  This was interpreted by the gang expert, and Sanchez,

---

[5] Fisher's mother denied telling anyone her son buried something in the backyard or did the laundry.  The coworker testified in defendants' case and claimed that Fisher's mother told her nothing about digging holes in the backyard, throwing away shoes, or doing laundry.

as referring to the killing of a Sureño gang member.  Finally, the phone was used four more times in the space of three minutes to call the number of Alcantara's girlfriend, Regina Ramirez.

Evidence was also admitted that on the day prior to the murder and the day after, telephone calls made from Fisher's telephone included the area code, while on the night of the murder, several of these calls did not include the area code.

Steven Estaban Ramirez confirmed that on the night of the murder someone called his home from Fisher's cellular telephone.  At that time, he was not home.  Steven Estaban Ramirez claimed that he did not speak with either defendant or Sanchez that night.  Steven Estaban Ramirez admitted he was once a Norteño gang member.

At lunch the day after the homicide, Fisher confessed to his coworker, Jeff Nickell, that he had stabbed someone in the neck with a pocketknife the prior night.  Fisher said that he did not plan the stabbing, but that it was something that had just happened.  Fisher told Nickell that he had been driving around with two other men in a pickup and they got into a fight with a fourth man.

The following day, Fisher repeated his admission to Nickell and Nickell's father.  Nickell testified that Fisher seemed to be shocked--like he did not know that the person had died.  The two convinced Fisher to go to the police where he confessed.

A search of Fisher's bedroom turned up a red hat, tennis shoes with red laces, and several magazines.  Red is the color associated with the Norteño gang.  Officers also found a hand-written memorial to Johnny Moreno--the fellow Norteño gang member who was killed by a member of the Sureño gang.  Officers also found a photograph of five people on which was written the letters "SK,"[6] the number "187" and the words "all scrapas."  "187" is the Penal Code section for murder; "scrapas" is a derogatory slang term for Sureño gang members.  The officers also found a picture of Steven Estaban Ramirez in Fisher's room.  The officers found a backpack buried in Fisher's backyard that contained several handguns--one of which was semiautomatic.

The police spoke with Sanchez about a month after the murder.  Sanchez denied any involvement.  The police came back the next day and took Sanchez to the police department. During that interview, Sanchez told Lodi Police Detective Sierra Brucia, "'I'm part of this'"and confessed his involvement in the crime.

---

[6]  In the defendants' case, Alcantara testified "SK" means "scrap killer."

The police questioned Alcantara at his home about a month after the murder.  Alcantara said that he knew about the murder and was at home on the evening of the murder.  When questioned whether he was involved, he responded, "[W]ell, I don't think so" and then "no."  At the time, he appeared to the officer to be despondent and his eyes teared up.  Alcantara said he had last seen Fisher about a week before the murder, and had not seen him since the murder.[7]  He admitted he used to be a Norteño gang member, but claimed he did not gang bang anymore.  In a prior interview in 1998, Alcantara admitted to a police officer that he was a member of the Norteño gang.

A search of Alcantara's bedroom uncovered a copy of a newspaper article about the drive-by shooting of Johnny Moreno.  Officers also found Alcantara's elementary school yearbook.  On the page with Alcantara's picture, someone had written the Roman numeral XIV in red and highlighted Alcantara's name.  The yearbook also contained derogatory statements about "scaps" and "scrapas" and the names of Sureño gang members were crossed out.  In his closet, officers found a shoebox with the number XIV, the word "Norteno" and the letters SCL written on it.  Other items in his room contained similar gang words and symbols on them.  In the master bedroom of the house, officers found a copy of the local newspaper article about this homicide.

Lodi Police Officer Alonzo Scott Powell testified as an expert on gangs.  He concluded that both defendants were gang members.  He further asserted that Steven Estaban Ramirez was of high rank in the Norteño street gang.  It was his opinion that the homicide here was committed for the benefit of the Norteño gang.

At the close of the People's case, Alcantara moved for acquittal under section 1118.1 on the ground that there was no evidence that corroborated Sanchez's testimony that Alcantara was connected with the murder.  The trial court denied this motion.

III
Defendants' Case

Fisher testified on his own behalf.  He is 5 feet 9 inches tall and weighed about 135 pounds on the day of the attack.  He confirmed he was in the Norteño gang between the ages of 13 and 16.  He admitted he had an alcohol and drug problem and that he was drinking and under the influence of Vicodin on the day of the killing.

Fisher confirmed that Sanchez and Alcantara came over to his

---

[7]  During rebuttal, Lodi Police Officer Brian Scott testified that Alcantara denied being at Fisher's house the day of the murder.  He also denied having been in Sanchez's pickup.

7

house that afternoon and that the three went to Lodi to purchase beer. They stopped over at a friend's house to convince the friend to buy beer and wound up staying to watch football games.

After the football games, they decided to go to another friend's house to get some more beer. At the second friend's home, Fisher saw that Alcantara had a stun gun and he was trying it out. At that time, Alcantara said he wanted to try the stun gun on someone. Fisher told Alcantara that was crazy. By this time, Fisher had consumed 8 to 10 beers.

Sanchez, Fisher, and Alcantara got into the vehicle to go pick up a friend who had a 30-pack of beer. Fisher had a knife. When they saw Carlos Ramirez, they pulled the pickup over and Alcantara got out. He walked up to Carlos Ramirez and Delgado and started talking to them in Spanish. Fisher claimed he could not tell whether Carlos Ramirez was a gang member because it was so dark.

Fisher testified that Alcantara used the stun gun on Carlos Ramirez and then a fight broke out. It was two-on-one--Carlos Ramirez and Delgado against Alcantara.[8] The victim was much larger than either of the defendants. It looked to Fisher like Carlos Ramirez was hitting Alcantara. Fisher ran to Alcantara's aid. Fisher did not remember taking out the knife or opening it, but he remembered swinging it around. Fisher did not see any weapon in Carlos Ramirez's hands when he pulled out his knife. Fisher thought he hit Carlos Ramirez two or three times with the knife, but he had no intent to kill him. He described the altercation as "[j]ust a fist fight."

Fisher ran back to the pickup. He confirmed that Alcantara had an injury on his right thumb when they returned to the pickup. He could not remember how he got home that night.

Fisher testified that the three men never planned to kill a Sureño. The first time Fisher knew the victim was dead was the day he turned himself in. Further, Fisher testified Alcantara told him not to name Alcantara as the one who started the fight, but instead he should blame Sanchez.

Fisher denied punching the code "13*187" into the cellular telephone. He also testified he did not know Alcantara's girlfriend's telephone number. Fisher often let others use his cellular telephone. He did not remember using his telephone after the killing. He also testified it is his habit and custom to always dial the area code before the number.

[8] In the rebuttal phase, Delgado again denied being involved in the fight.

8

Fisher claimed he was holding the guns found in his backyard for another gang member.  He testified he received the guns a couple of months before the killing and buried them the night after the killing.

Fisher also presented the testimony of Dr. Gary Cavanaugh, a psychiatrist.  Dr. Cavanaugh testified that Fisher's alcohol use and reported periods of alcoholic blackouts could have affected his ability to premeditate, deliberate, and form a specific intent to kill.  The doctor believed that Fisher exaggerated his alcohol use.  Fisher also admitted to Dr. Cavanaugh that Alcantara said that he was going to use the stun gun on the first person he saw.

During his confession to the police, Fisher told them that he had words with Carlos Ramirez and then things escalated and he got scared.  He further claimed not to remember everything because he was not in his right mind.

During the defendants' case, Sanchez testified he and the defendants never planned to kill anyone.  Further, he testified he did not see a knife or a stun gun the night of the murder.

Alcantara's girlfriend, her sister, and her mother testified that Alcantara was at home the night of the murder between 6:30 and 9:30 p.m.  His girlfriend testified that he was there all night.  Alcantara testified to the same effect.

Alcantara testified he spent time at Fisher's house, and then went with Sanchez and Fisher to a friend's home, and then to a second friend's home.  Finally, Alcantara claimed he returned to his own home a little after 6:00 p.m. for dinner and did not leave the rest of the night.

Alcantara testified he never spoke about killing or hurting anyone.  He did not know the victim.  He did not have a stun gun, but claimed Sanchez did.  He further testified he had surgery on his right thumb from a wrestling injury.

Alcantara admitted he was once a member of the Norteño gang.  He claimed, however, that he was no longer a part of that gang.

Alcantara testified that he believed that Fisher and Sanchez lied about him because they had a grudge against him.  The alleged grudge stemmed from a prior incident where they believed Alcantara had identified them to the police in a crime.  Alcantara also testified that Fisher told him that he was going to testify that he was trying to protect Alcantara because it was the only way he could avoid a life sentence.

Alcantara admitted that he lied to the officers when they questioned him.  He lied about not going out and drinking with

Fisher and Sanchez.  In a subsequent police interrogation, he also lied to the officers about the fact that he had not seen Sanchez and Fisher the day of the murder.[9]

Alcantara's brother, Leo Alcantara, testified the shoebox with gang symbols on it that was taken from his house belonged to Leo Alcantara.  Further, Leo Alcantara had never seen his brother with a stun gun.

The Department of Justice was unable to find any blood in Sanchez's pickup.  They were also unable to find any of Alcantara's fingerprints on the pickup.

IV
The Verdict And Sentencing

The jury convicted both defendants of murder in the second degree and street terrorism.  Further, the jury concluded the street terrorism enhancement allegations and the personal use of the deadly weapon enhancement allegation were true.

The trial court sentenced Alcantara to 15 years to life in state prison on the murder charge and imposed a consecutive 10-year sentence for the gang enhancement.  As to Fisher, the court sentenced him to 15 years to life in state prison.  The court struck Fisher's 10-year consecutive sentence under the gang enhancement statute.  The court also imposed a one-year state prison sentence on Fisher for using the knife in conjunction with the murder.  As to both defendants, the court imposed and stayed three-year sentences for the charge of street terrorism.  Defendants appeal.

(People v. Fisher, et al., slip op. at 3-17.)

IV.  Standards for a Writ of Habeas Corpus

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citation omitted). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be used to try state issues de

---

[9]  In an intriguing display of candor in response to the prosecutor's question of whether Alcantara was telling "100 percent the truth." Alcantara replied, "maybe not 100 percent."

1   novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

2      This action is governed by the Antiterrorism and Effective Death Penalty Act of

3   1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d

4   1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

5   habeas corpus relief:

6     An application for a writ of habeas corpus on behalf of a person
    in custody pursuant to the judgment of a State court shall not be

7   granted with respect to any claim that was adjudicated on the
    merits in State court proceedings unless the adjudication of the

8   claim -

9      (1) resulted in a decision that was contrary to, or involved
    an unreasonable application of, clearly established Federal law, as

10  determined by the Supreme Court of the United States; or

11     (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the

12  State court proceeding.

13  28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

14  Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

15     Under section 2254(d)(1), a state court decision is "contrary to" clearly

16  established United States Supreme Court precedents if it applies a rule that contradicts the

17  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

18  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

19  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citation omitted).

20     Under the  "unreasonable application" clause of section 2254(d)(1), a federal

21  habeas court may grant the writ if the state court identifies the correct governing legal principle

22  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

23  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

24  simply because that court concludes in its independent judgment that the relevant state-court

25  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

26  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

1    (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

2    question, is left with a 'firm conviction' that the state court was 'erroneous.'")

3            The court looks to the last reasoned state court decision as the basis for the state

4    court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

5    court reaches a decision on the merits but provides no reasoning to support its conclusion, a

6    federal habeas court independently reviews the record to determine whether habeas corpus relief

7    is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

8    Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) ("Independent review of the record is not de

9    novo review of the constitutional issue, but rather, the only method by which we can determine

10   whether a silent state court decision is objectively unreasonable."); accord Pirtle v. Morgan, 313

11   F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not reached the merits of

12   a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential

13   standard does not apply and a federal habeas court must review the claim de novo.  Nulph v.

14   Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle, 313 F.3d at 1167.

15   V.  Petitioner's Claims

16           A.  Insufficient Corroborating Evidence

17           Petitioner contends there was insufficient evidence to corroborate Sanchez'

18   testimony as required by California Penal Code § 1111.  Respondent argues that petitioner's

19   claim is not cognizable in federal habeas review, but that, in any event, petitioner's due process

20   rights were not violated.

21           The last reasoned rejection of this claim is the decision of the California Court of

22   Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

23   this claim as follows:

24           Alcantara argues "[t]here was insufficient evidence to connect
             [him] to the homicide independent of the testimony of Sanchez, an
25           accomplice."  Thus, he argues the trial court should have granted

26

his motion for a judgment of acquittal under section 1118.1.[10]  We disagree.

Section 1111 provides, "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.  An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

"Evidence that sufficiently corroborates an accomplice's testimony '"must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime[,] but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged.' [Citation.]" The evidence necessary to corroborate accomplice testimony need only be slight, such that it would be entitled to little consideration standing alone.  [Citation.] It is enough that the corroborative evidence tends to connect defendant with the crime in a way that may reasonably satisfy a jury that the accomplice is telling the truth.  [Citation.]"  (*People v. Narvaez* (2002) 104 Cal.App.4th 1295, 1303, 128 Cal.Rptr.2d 899.)  "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]"  (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271, 91 Cal.Rptr.2d 211, 989 P.2d 645.) Adequate corroboration may consist of evidence of the defendant's conduct or declarations (*People v. Garrison* (1989) 47 Cal.3d 746, 773, 254 Cal.Rptr. 257, 765 P.2d 419), including evidence showing a consciousness of guilt such as the defendant's flight after the crime (*People v. Zapien* (1993) 4 Cal.4th 929, 982-983) or contradictory, false, or misleading statements made to a police officer after arrest (*People v. Zack* (1986) 184 Cal.App.3d 409, 418, 229 Cal.Rptr. 317).

When reviewing the denial of a motion under section 1118.1, made at the close of the prosecution's case-in-chief, the reviewing court, like the trial court, may consider only the evidence then in the record.  (*People v. Belton* (1979) 23 Cal.3d 516, 526-527, 153 Cal.Rptr. 195, 591 P.2d 485.)  "[U]nless a reviewing court determines that the corroborating evidence should not have been admitted or that it could not reasonably tend to connect a defendant

---

[10]  Section 1118.1 provides, "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

with the commission of a crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal. [Citations.]"  (*People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543, 248 Cal.Rptr. 60.)

Here, Alcantara contends the evidence does not tend to connect him with this offense. We disagree.

Delgado's testimony that he heard the phrase "Norte cartorce" during the crime established that this was a gang crime committed in the name of the Norteño gang.  Further, the objective evidence that the numbers 13 (meaning Sureño) and 187 (meaning murder) were punched into Fisher's telephone after the homicide confirmed the gang nature of this crime.  Alcantara's gang affiliation with the Norteño gang was independently established by his own admission that he was a Norteño.  In his home, the police uncovered newspapers that contained articles about the killing of a fellow Norteño, Johnny Moreno, and the instant killing.

The evidence also established that Alcantara was with Sanchez and Fisher four hours before the killing and left with those two men in Sanchez's pickup to go buy beer in Lodi, where the killing occurred.

The next evidence that tends to connect Alcantara to the crime is the scar on his thumb.  According to Sanchez, Alcantara allegedly cut his thumb in the fight.  Alcantara's hands and the scar on his thumb were shown to the jury.  Given the description of the knife wounds to the victim provided by the pathologist, the scar from a cut on Alcantara's hand tended to tie him to the homicide.

Next, the People presented the evidence of the records of Fisher's cellular telephone.  Those records demonstrate that someone attempted to contact Steven Estaban Ramirez after the murder. Steven Estaban Ramirez is an admitted member of the same gang as Sanchez, Fisher, and Alcantara.  According to the police testimony, Steven Estaban Ramirez was a high-ranking member of that gang.

The phone records also establish that someone repeatedly attempted to contact Alcantara's girlfriend, Regina Ramirez, immediately after the murder.  Regina Ramirez testified she never received any telephone calls from Fisher.  The fact that these telephone numbers were dialed without the area code in light of the pattern on the cellular phone bill further tended to exclude Fisher as the caller.

Finally, Alcantara lied to police when he told them he was not with Sanchez and Fisher the day of the homicide.  He made it worse when he claimed not to have seen Fisher for at least a week prior to the killing.  That testimony was refuted by James Fisher's

1

independent testimony that the three men were together on that day.

2

3

Not only did he lie about his association with the others involved in the homicide on the day of the murder, Alcantara was equivocal about his involvement in the murder when he responded he "[d]idn't think" he was involved. He also appeared despondent to the police officer who questioned him which suggested exactly the opposite was the truth.

4

5

6

Alcantara attempts to give a logical explanation as to why each item of evidence independently does not tend to corroborate Sanchez's testimony. This is the wrong test. Instead, we must view the evidence "as a whole" to see if it "tends to connect the appellant to the crimes committed in such a manner as could reasonably satisfy the jury and the trial judge that the accomplice ... was telling the truth." (*People v. Neely* (1958) 163 Cal.App.2d 289, 304, 329 P.2d 357.) Measured by this standard, the evidence sufficiently corroborates Sanchez's testimony. The trial court did not err.

7

8

9

10

11

12

(People v. Fisher, et al., slip op. at 17-21.)

13

The rule set forth in California Penal Code § 1111 is not required by the

14

Constitution or federal law, provided that the uncorroborated testimony is not "incredible or

15

insubstantial on its face." Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000) (citing United

16

States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993) ("The uncorroborated testimony of an

17

accomplice is sufficient to sustain a conviction unless it is incredible or insubstantial on its

18

face.")). Here, Sanchez' testimony was neither incredible nor insubstantial on its face, and

19

because the corroboration of accomplice testimony is not required under federal law, habeas

20

relief is warranted only if the alleged violation of California Penal Code § 1111 denied petitioner

21

his due process right to fundamental fairness. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)

22

("it is not the province of a federal habeas court to reexamine state-court determinations on

23

state-law questions").

24

The Supreme Court has held that a defendant's due process right to a fair trial is

25

violated if the defendant is arbitrarily denied a state law entitlement. See Laboa, 224 F.3d at 979

26

(citation omitted). Under California law, the corroborating evidence "need not corroborate every

15

fact to which the accomplice testified or establish the corpus delicti, but is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." People v. Fauber, 2 Cal.4th 792, 834, 9 Cal.Rptr.2d 24 (1992).  Here, petitioner was not denied fundamental fairness because Sanchez' testimony was adequately corroborated by other evidence.  Specifically, as explained above, Sanchez' testimony was corroborated by the following evidence:  (1) the killing was committed by Norte gang members, and petitioner belonged to that gang (Reporter's Transcript ("RT") 1566); (2) newspaper articles about Ramirez' death and an earlier murder of a Norte gang member were found in petitioner's home (RT 1334; 1336-37); (3) petitioner was seen four hours before the murder in a pickup truck with Fisher and Sanchez headed for Lodi, where the killing was committed by male gang members who were seen riding in a pickup truck (RT 1066; 699-700); (4) petitioner had a scar on his thumb in the same place Sanchez described petitioner's injury from the fight (RT 745; 895); (5) petitioner's girlfriend was called repeatedly from Fisher's cell phone right after the murder; the number was dialed in a different way from Fisher's normal practice (RT 1151, 1153, 1155, 1156-58; 1159-60; 1188); and (6) petitioner, despondent, later told police he "didn't think" he was involved in Ramirez' murder (RT 1564) and also lied about the last time he saw Fisher and Sanchez.

In light of this corroborating evidence, petitioner's due process rights were not violated because he was not denied the protection of California Penal Code § 1111.  See Laboa, 224 F.3d at 979-90 (rejecting procedural due process claim where sufficient corroborating evidence satisfied section 1111.)  Thus, the state court's rejection of petitioner's first claim for relief was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent.  Accordingly, petitioner's first claim for relief should be denied.

### B.  Jury Instruction Claims

Petitioner raises several claims of jury instruction error.  After setting forth the applicable legal principles, the court will analyze these claims in turn below.

1         A challenge to jury instructions does not generally state a federal constitutional

2  claim.  See Middleton v. Cupp, 768 F.2d at 1085 (citation omitted); Gutierrez v. Griggs, 695

3  F.2d 1195, 1197 (9th Cir. 1983).  Habeas corpus is unavailable for alleged error in the

4  interpretation or application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn,

5  807 F.2d 805, 814 (9th Cir. 1987).  In order to warrant federal habeas relief, challenged jury

6  instructions "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but

7  must violate some due process right guaranteed by the fourteenth amendment."  Prantil v.

8  California, 843 F.2d 314, 317 (1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To

9  prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the

10  entire trial that the resulting conviction violates due process.'"  Prantil, 843 F.2d at 317 (quoting

11  Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987)).  See also Estelle, 502 U.S. at 72.  The

12  analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a

13  due process violation is similar to the analysis used in determining, under Brecht v. Abrahamson,

14  507 U.S. 619, 623 (1993), whether an error had "a substantial and injurious effect" on the

15  outcome.  See McKinney v. Rees, 993 F.2d 1378, 1385 (9th Cir. 1993).

16         In making its determination, this court must evaluate the challenged jury

17  instructions "'in the context of the overall charge to the jury as a component of the entire trial

18  process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

19  1984)).  The United States Supreme Court has cautioned that "not every ambiguity,

20  inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."

21  Middleton v. McNeil, 541 U.S. 433, 437 (2004).  Further, in reviewing an allegedly ambiguous

22  instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has

23  applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502 U.S. at

24  72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)); see also United States v. Smith, 520

25  F.3d 1097, 1102 (9th Cir. 2008).  Where the challenge is to a refusal or failure to give an

26  instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an

incomplete instruction, is less likely to be prejudicial than a misstatement of the law."

Henderson v. Kibbe, 431 U.S. 145, 155 (1977); see also Villafuerte v. Stewart, 111 F.3d 616,

624 (9th Cir. 1997).

The burden upon petitioner is greater yet in a situation where he claims that the

trial court did not give an instruction sua sponte. To the extent that petitioner rests his claim on a

duty to give an instruction sua sponte under rules of state law, petitioner has stated no federal

claim. Indeed, in the failure to give a lesser included offense instruction context, the Ninth

Circuit has held in non-capital cases that the failure to give the instruction states no federal claim

whatsoever. James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976). Therefore, in order to violate

due process, the impact on the proceeding from failure to give an instruction sua sponte must be

of a substantial magnitude.

### i. Accomplice Jury Instruction

In his second claim, petitioner contends that the trial court erred by refusing to

instruct the jury that Sanchez was an accomplice, and incorrectly defined "accomplice" to

exclude Sanchez, rendering the cautionary instructions regarding accomplice testimony

inapplicable, violating petitioner's due process rights. Respondent contends that because

accomplice instructions are not required by due process, no constitutional violation occurred, but

that, in any event, it is unlikely the jury misunderstood that "accomplice" excluded Sanchez. In

the alternative, respondent argues that any state law error was harmless in light of the evidence

corroborating Sanchez' testimony.

The last reasoned rejection of this claim is the decision of the California Court of

Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed

this claim as follows:

> Alcantara next argues that the trial court erred in failing to
> instruct the jury that Sanchez was an accomplice as a matter of law
> if they found that murder had been committed. We reject this
> claim.

For a witness to be an accomplice such that corroboration of his or her testimony is required, the witness must be chargeable as a principal with the identical crimes charged against the defendant (§ 31); but the fact the witness has been charged or held to answer for the same crimes as the defendant and then granted immunity does not necessarily establish that he or she is an accomplice. (*People v. Fauber* (1992) 2 Cal.4th 792, 833-834, 9 Cal.Rptr.2d 24, 831 P.2d 249; *People v. Stankewitz* (1990) 51 Cal.3d 72, 90, 270 Cal.Rptr. 817, 793 P.2d 23.)  To establish that a witness is an accomplice as a matter of law, the record must show as a matter of law either that the witness aided and abetted the defendant or was involved in a conspiracy in which the witness harbored the intent to commit the offense that was the object of the conspiracy. (*People v. Garceau* (1993) 6 Cal.4th 140, 183, 24 Cal.Rptr.2d 664, 862 P.2d 664.)

A person's liability as an aider depends on whether he or she promotes, encourages, or assists the perpetrator and shares the perpetrator's criminal purpose.  It is not sufficient if the person merely gives assistance without knowledge of the perpetrator's purpose (*People v. Stankewitz, supra,* 51 Cal.3d at pp. 90-91, 270 Cal.Rptr. 817, 793 P.2d 23), and an individual's presence at the scene of a crime or failure to prevent its commission is insufficient to establish aiding and abetting.  (*Ibid.*)  Furthermore, assisting in the escape of a principal results in liability as an accessory, not as a principal.  (*People v. Hoover* (1974) 12 Cal.3d 875, 879, 117 Cal.Rptr. 672, 528 P.2d 760.)  Unless there is no dispute as to either the facts or the inferences to be drawn therefrom, the issue of whether a person is an accomplice is a question of fact for the jury. (*People v. Fauber, supra,* 2 Cal.4th at p. 834, 9 Cal.Rptr.2d 24, 831 P.2d 249.)

Here, the facts as to whether Sanchez was an accomplice were disputed and the trial court correctly determined that the jury would have to decide this question.  Sanchez testified that he never planned to kill anyone the night of the murder.  Further, he did not see a knife or a stun gun at all that night.  The jury could have credited that testimony and determined Sanchez did not have the requisite intent for murder under an accomplice theory of liability. (*People v. Stankewitz, supra,* 51 Cal.3d at pp 90-91, 270 Cal.Rptr. 817, 793 P.2d 23 [an aider and abettor must act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing or of encouraging or facilitating the commission of the offense.] )  Further, under the "natural and probable consequences" theory of liability, the question of whether murder was a natural and probable consequence of the target crimes here was a question of fact for the jury to determine. (*People v. Montano* (1979) 96 Cal.App.3d 221, 227, 158 Cal.Rptr. 47; see discussion, part IC1, post.)  Thus, the trial court did not err in concluding it should not instruct the jury that Sanchez was an accomplice as a matter of law.

On the subject of accomplices, the trial court instructed the jurors as follows: "An accomplice is a person who is subject to prosecution for the identical offenses charged in Counts 1 and 2, *and the enhancements in Count 1*, against the defendant on trial by reason of aiding and abetting."[11]  (Italics added.)  Alcantara correctly points out this was error. (§ 1111; *People v. Maldonado* (1999) 72 Cal.App.4th 588, 597, 84 Cal.Rptr.2d 898 [corroboration requirement of section 1111 does not apply to enhancements].)

"Failure to instruct pursuant to section 1111 is harmless if there is sufficient corroborating evidence." (*People v. Hayes, supra,* 21 Cal.4th at p. 1271, 91 Cal.Rptr.2d 211, 989 P.2d 645.)  As we have already determined, sufficient corroborating evidence was adduced in this case to corroborate Sanchez's testimony.  (See section IA, ante.)  Thus, this error was harmless.

(People v. Fisher, et al., slip op. at 21-24.)

First, petitioner cannot fault the trial court under federal law for not giving a sua sponte accomplice instruction.  Petitioner does not have a federal due process right to a cautionary accomplice instruction.  As noted above, relief will not lie for alleged errors of state law in conducting a trial.  Estelle, 502 U.S. at 71-72.  Only if the alleged state law error encompasses an established federal right of fundamental importance can relief be given.  Id.  As respondent points out, federal law does not require evidence beyond that given by an accomplice to sustain a conviction.  United States v. Necoechea, 986 F.2d at 1282.  Thus, a conviction obtained in state court primarily or only on accomplice testimony cannot be challenged as a "federal error."  Moreover, a cautionary instruction regarding an accomplice's testimony cannot be a fundamental due process requirement.  United States v. Fritts, 505 F.2d 168, 169 (9th Cir. 1974).

Second, the jury instruction as given included the language "and the enhancements to count 1," which erroneously narrowed the definition of an accomplice under

---

[11]  The trial court also gave additional instructions on accomplices: CALJIC No. 3.11 (testimony of accomplice must be corroborated); CALJIC No. 3.12 (sufficiency of evidence to corroborate an accomplice); CALJIC No. 3.14 (criminal intent necessary to make one an accomplice); CALJIC No. 3.18 (testimony of accomplice to be viewed with care and caution); and CALJIC No. 3.19 (burden to prove corroborating witness is an accomplice).

California state law.  Under California law, an accomplice is "one who is liable for the identical offense charged against the defendant on trial" Cal. Penal Code § 1111, without regard to charged enhancements.  As noted by the state court, additional instructions regarding accomplice liability were also given.  (See n.11 supra.)

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the erroneous jury instruction "so infused the trial with unfairness as to deny due process of law." Estelle, 502 U.S. at 75 (1991) (quoting Lisenba v. California, 314 U.S. 219, 228 (1941)).  If the state court disposed of a constitutional error as harmless under an appropriate standard of review, federal courts must, for purposes of application of the "unreasonable application" clause of § 2254(d) (1), first determine whether the state court's harmless error analysis was objectively unreasonable.  Medina v. Hornung, 386 F.3d 872, 878 (9th Cir. 2004).  If the federal court determines that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, the federal court then proceeds to the harmless error analysis under Brecht, 507 U.S. at 637; Medina, 386 F.3d at 877.

The state court concluded the error in accomplice jury instruction was harmless because there was sufficient corroborating evidence to corroborate Sanchez' testimony.

Under Brecht, habeas relief is not warranted unless the error had a substantial and injurious effect or influence in determining the jury's verdict.  Id. at 637.  Although the state appellate court did not identify Brecht in its harmless error analysis, it applied a harmless error standard that comports with federal law.  See Medina, 386 F.3d at 878.  Because the state appellate court's approach to petitioner's claim was consistent with the Supreme Court's holding in Brecht, the state court's application of the harmless error analysis was not objectively unreasonable.  See id.  Furthermore, because the error was harmless, it cannot be said that the jury instruction "so infused the trial with unfairness as to deny due process of law." Estelle, 502 U.S. at 75.

1    Accordingly, the state court's decision to reject this claim was neither contrary to

2    nor an unreasonable application of clearly established federal law, nor was it an unreasonable

3    determination of the facts in light of the evidence presented.

4    ii.  Natural and Probable Consequences and Lesser Target Crimes

5    Petitioner argues that the trial court's sua sponte instructions failed to clarify that

6    the jury could convict petitioner of a lesser degree of homicide than Fisher under the doctrine of

7    natural and probable consequences, or that defense counsel was ineffective for failing to request

8    such an instruction.  Petitioner also contends that the trial court's natural and probable

9    consequences instruction improperly failed to include definitions for the lesser target crimes of

10   misdemeanor assault and battery.  Petitioner argues these errors violated his right to due process.

11   Respondent contends that all of the instructions were constitutionally adequate.

12   a.  Natural and Probable Consequences

13   The last reasoned rejection of this claim is the decision of the California Court of

14   Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

15   these claims as follows:

16       Alcantara argues the trial court erred because the "jury
         instructions on the natural and probable consequences doctrine
17       failed to convey that [Alcantara] could be found guilty of a lesser
         degree of homicide than Fisher." Alcantara postulates he could be
18       found guilty of involuntary manslaughter as the natural and
         probable consequences of his nonlethal assault on Carlos Ramirez
19       even when Fisher was convicted of murder.  We conclude the court
         properly instructed the jurors. Alcantara also argues the trial court
20       erred by failing to define the target offenses of assault and battery.
         We agree this was error, but find that error harmless.

21
         1. The Court Properly Instructed On Aider And Abettor Liability
22
         Alcantara cites *People v. Woods* (1992) 8 Cal.App.4th 1570, 11
23       Cal.Rptr.2d 231, for the proposition the trial court had a "sua
         sponte duty to instruct that [Alcantara] could be found guilty of a
24       lesser degree of homicide than Fisher."  Not so.

25       In *People v. Woods, supra,* 8 Cal.App.4th at pages 1570, 1579,
         11 Cal.Rptr.2d 231, in response to a question from the jury during
26       deliberations, the trial court instructed the jury that the defendant

who aided and abetted a murder could not be found guilty of second degree murder if the actual perpetrator of the same murder was found guilty of first degree murder.  We concluded this instruction was erroneous.  (*Id.* at p. 1578, 11 Cal.Rptr.2d 231.) We held "an aider and abettor may be found guilty of a lesser crime than that ultimately committed by the perpetrator where the evidence suggests the ultimate crime was not a reasonably foreseeable consequence of the criminal act originally aided and abetted, but a lesser crime committed by the perpetrator during the accomplishment of the ultimate crime was such a consequence. Accordingly, even when necessarily included offense instructions are not required for the perpetrator because the evidence establishes that, if guilty at all, the perpetrator is guilty of the greater offense, the trial court has a duty to instruct sua sponte on necessarily included offenses for the aider and abettor if the evidence raises a question whether the greater offense is a reasonably foreseeable consequence of the criminal act originally contemplated and abetted, but would support a finding that a lesser included offense committed by the perpetrator was such a consequence." (*Id.* at p. 1577-1578, 11 Cal.Rptr.2d 231.)

Similarly our Supreme Court has also concluded a jury may, in the appropriate case, convict a defendant of a greater crime than that of the confederate he aids and abets. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1122, 108 Cal.Rptr.2d 188, 24 P.3d 1210.) Neither of these cases, however, holds that the trial court has an obligation to sua sponte instruct the jurors that a codefendant can be convicted of a lesser or a greater degree of homicide than the person who actually killed the victim.  The trial court need only instruct the jurors on each of the crimes the defendants may have committed and the necessarily lesser included offenses.

Here, the trial court instructed the jurors that they "must decide separately whether each of the defendants is guilty or not guilty.  If you cannot agree upon a verdict as to both defendants, but do agree upon a verdict as to any one of them, you must render a verdict as to the one to whom you agree." (CALJIC No. 17.00.)  Further, the trial court instructed the jurors that an aider and abettor is only guilty of those crimes that he aids and abets and those crimes that are the "natural and probable consequences of the crime originally aided and abetted." (CALJIC No. 3.02.)  The trial court informed the jury it had to determine whether the murder or lesser included offenses of voluntary manslaughter and involuntary manslaughter were the natural and probable consequences of the target crimes of assault, battery, or assault with a deadly weapon committed by Alcantara.  The jury was also given complete instructions on murder and the lesser included offenses of voluntary manslaughter and involuntary manslaughter.  Thus, the jury was properly instructed it had to determine Alcantara's guilt separately from that of Fisher, and that Alcantara could be convicted only of crimes that were the natural and probable consequences of the crimes he aided

1    and abetted.  This satisfied the requirements of *People v. Woods,*
     *supra,* 8 Cal.App.4th 1570, 11 Cal.Rptr.2d 231.  The trial court had
2    no additional duty to further emphasize that Alcantara could have
     been convicted of a lesser or greater crime than Fisher.

3
         Given that the trial court properly instructed the jury on this
4    subject, trial counsel was not ineffective for failing to ask for
     additional instructions on this point.

5
         We further reject Alcantara's argument CALJIC No. 3.00 "when
6    considered with CALJIC No. 3.02, strongly implies that the
     doctrine [of accomplice liability] may be used to find [Alcantara]
7    guilty of the same crime as Fisher ... but not a lesser degree of
     homicide."  CALJIC No. 3.00, as read to the jury, states:  "Persons
8    who are involved in committing a crime are referred to as
     principals in that crime.  Each principal, regardless of the extent or
9    manner of participation is equally guilty.  Principals include:  [¶]
     One, those who directly and actively commit or attempt to commit
10   the act constituting the crime; [¶]  Or, two, those who aid and abet
     the commission of the crime."  As the jury was instructed, this
11   introductory instruction on aiding and abetting liability must be
     read in light of the other instructions we have just identified.
12   (CALJIC No. 1.01; *People v. Johnson* (1992) 3 Cal.4th 1183,
     1236, 14 Cal.Rptr.2d 702, 842 P.2d 1.)  These instructions taken as
13   a whole expressly direct the jury to consider the guilt of each
     defendant separately and further inform the jury that each
14   defendant is guilty of only those crimes that they aid and abet in or
     which are the natural and probable consequences of those crimes
15   they aided and abetted.  We conclude these instructions are not
     misleading.

16
         We further reject Alcantara's argument that murder was not a
17   natural and foreseeable consequence of his attack on the victim
     with a stun gun.  The jury could rationally conclude when these
18   gang members attempted to use a stun gun on a rival gang member,
     the natural and probable consequence of this gang attack was
19   murder. (*People v. Montano, supra,* 96 Cal.App.3d at p. 227, 158
     Cal.Rptr. 47 ["The frequency with which such gang attacks result
20   in homicide fully justified the trial court in finding that homicide
     was a 'reasonable and natural consequence' to be expected in any
21   such attack"].)  Whether this homicide was a natural and probable
     consequence of this gang attack was a question of fact for the jury
22   to resolve. (*People v. Woods, supra,* 8 Cal.App.4th at p. 1594, 11
     Cal.Rptr.2d 231.)

23

24   (People v. Fisher, et al., slip op. at 24-27.)

25           This court concludes that the failure to give the clarifying instruction suggested by

26   petitioner did not result in a due process violation.  All of the jury instructions, taken together,

1    made clear that the jury was to decide each defendant's guilt separately.  (CT 690.)  The jury was

2    instructed that an aider and abettor could only be found guilty of those crimes "committed by a

3    principal which [are] a natural and probable consequence of the crime originally aided and

4    abetted."  (CT 633.)  The jury was instructed that

5         In order to find the defendant guilty of the crime of Murder, as
          charged in Count 1, or the lesser included offenses of Voluntary
6         Manslaughter or Involuntary Manslaughter, you must be satisfied
          beyond a reasonable doubt that:
7
          1.  The crime or crimes of Assault, Battery, or Assault With a
8         Deadly Weapon was committed;

9         2.  That the defendant aided and abetted those crimes;

10        3.  That a co-principal in that crime committed the crime of
          Murder, as charged in Count 1, or the lesser included offenses of
11        Voluntary Manslaughter or Involuntary Manslaughter; and

12        4.  The crimes of Murder, as charged in Count 1, or the lesser
          included offenses of Voluntary Manslaughter or Involuntary
13        Manslaughter was a natural and probable consequence of the
          commission of the crimes of Assault, Battery, or Assault with a
14        Deadly Weapon.

15        You are not required to unanimously agree as to which
          contemplated crime the defendant aided and abetted, so long as you
16        are satisfied beyond a reasonable doubt that the defendant aided
          and abetted the commission of the identified and defined target
17        crime and that the crime of homicide was a natural and probable
          consequence of the commission of that target crime.
18
          Whether a consequence is "natural and probable" is an objective
19        test based not on what the defendant actually intended but on what
          a person of reasonable and ordinary prudence would have expected
20        would be likely to occur.  The issue is to be decided in light of all
          of the circumstances surrounding the incident.  A "natural
21        consequence" is one which is within the normal range of outcomes
          that may be reasonably expected to occur if nothing unusual has
22        intervened.  "Probable" means likely to happen.

23   (CT 633-34.)  The jury was properly instructed on the elements of murder, voluntary

24   manslaughter and involuntary manslaughter.  (CT 645-60.)  Thus, the jury was properly

25   instructed that petitioner could only be convicted of crimes that were the natural and probable

26   consequences of the crimes he aided and abetted.  Accordingly, petitioner's trial was not

1  rendered unfair by the failure to specifically instruct the jury that petitioner could be convicted of

2  a lesser offense than Fisher.  See Spivey v. Rocha, 194 F.3d 971, 976-77 (9th Cir. 1999)

3  (CALJIC No. 3.02 was correct statement of law where the target crime was misdemeanor

4  brandishing and ultimate crime was second-degree murder.)

5      Petitioner argues that CALJIC 3.00 was confusing because it implied that an aider

6  and abettor may not be found guilty of a lesser offense than the perpetrator.  The jury was

7  instructed as follows:

8      Persons who are involved in committing a crime are referred to as
       principals in that crime.  Each principal, regardless of the extent or
9      manner of participation is equally guilty.  Principals include:

10     1.  Those who directly and actively commit the act constituting the crime, or

11     2.  Those who aid and abet the commission of the crime.

12  (CT 631.)  Petitioner contends that the use of the terms "equally guilty" prevented the jury from

13  finding petitioner guilty of a lesser offense than Fisher.

14      However, as noted above, this court is tasked with considering the jury

15  instructions as a whole.  CALJIC 3.00 addressed an aider's liability for a target offense whose

16  commission he directly assisted.  CALJIC 3.03 addressed an aider's liability for additional

17  crimes beyond the target offense, if the additional crimes were a natural and probable

18  consequence of the target offense.  As noted by the state court in its order modifying opinion,

19  "[t]hese instructions taken as a whole expressly direct the jury to consider the guilt of each

20  defendant separately and further inform the jury that each defendant is guilty of only those crimes

21  that they aid and abet in or which are the natural and probable consequences of those crimes they

22  aided and abetted."  (LD 6 at 2-3.)  The jury instructions as a whole establish that the jurors were

23  not misled by CALJIC 3.00.  There is no reasonable likelihood that the jury applied CALJIC 3.00

24  in the manner suggested by petitioner or in an unconstitutional way.  Thus, petitioner is not

25  entitled to habeas relief on this claim.

26  ////

1    Because the jury was properly instructed under California law, defense counsel

2    was not ineffective for failing to seek the jury instruction suggested by petitioner.  <u>Strickland v.</u>

3    <u>Washington</u>, 466 U.S. 668 (1984).

4                                b.  <u>Lesser Target Crimes</u>

5    Petitioner contends that the jury instructions regarding the natural and probable

6    consequences doctrine failed to define the elements of the target offenses.  Although this

7    omission was an error under state law, respondent contends no constitutional violation occurred.

8    The last reasoned rejection of this claim is the decision of the California Court of

9    Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

10   these claims as follows:

11        Alcantara also argues the trial court erred in failing to define
          assault or battery. We agree this was error; however, we conclude
12        this error was harmless.

13        In *People v. Prettyman* (1996) 14 Cal.4th 248, 268, 58
          Cal.Rptr.2d 827, 926 P.2d 1013, our Supreme Court held that
14        "when the prosecution relies on the 'natural and probable
          consequences' doctrine to hold a defendant liable as an aider and
15        abettor, the trial court must, on its own initiative, identify and
          describe for the jury any target offense allegedly aided and abetted
16        by the defendant....  [¶]  [B]ut the sua sponte duty to instruct that is
          imposed here is quite limited.  It arises only when the prosecution
17        has elected to rely on the 'natural and probable consequences'
          theory of accomplice liability and the trial court has determined
18        that the evidence will support instructions on that theory.  The trial
          court, moreover, need not identify all potential target offenses
19        supported by the evidence, but only those that the prosecution
          wishes the jury to consider."  (*Id.* at pp. 268-269, 58 Cal.Rptr.2d
20        827, 926 P.2d 1013, italics omitted.)

21        Here, the People identified three potential target crimes they
          intended to use as the basis for Alcantara's liability as an aider and
22        abettor to Fisher's act of homicide:  assault, battery, and assault
          with a deadly weapon.  During closing argument, the prosecutor
23        focused on this last crime.  Despite the clear mandate of
          *Prettyman*, however, the People provided the trial court with no
24        instructions on the definition of either assault or battery and the
          trial court failed to fulfill its duty to sua sponte instruct on this
25        point.  While the trial court did read CALJIC No. 9.02, defining the
          crime of "assault with a deadly weapon," it neglected to read
26        CALJIC No. 9.00, which defines assault.  Both the CALJIC Use

                                       27

Note and case law requires the court to define the term "assault" for the jury.  (Use Note to CALJIC No. 9.02; *People v. McElheny* (1982) 137 Cal.App.3d 396, 403-404, 187 Cal.Rptr. 39 [assault is not a commonly understood term and failure to define it "was instructional error warranting reversal of the assault charge"].)

"[W]hen a trial court instructs the jury on the 'natural and probable consequences' doctrine, but fails to identify and describe the target crime(s) allegedly contemplated by the defendant, there is a risk that the jury will 'indulge in unguided speculation' [citation] in making the requisite factual findings."  (*People v. Prettyman, supra,* 14 Cal.4th at p. 272, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)  In assessing whether such an error requires reversal, "'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citations.]"  (*Ibid.*)

Here, we conclude the trial court's error was harmless.  Under any scenario advanced by the defendants, Alcantara walked up to the victim and applied his stun gun to the victim's chest.  Properly instructed, the jury could not conclude anything but that Alcantara's actions constituted assault and/or battery.  (See CALJIC No. 9.00 [the elements of assault are:  "1.  A person willfully [and unlawfully] committed an act which by its nature would probably and directly result in the application of physical force on another person; [¶]  2.  The person committing the act was aware of facts that would lead a reasonable person to realize that as a direct, natural and probable result of this act that physical force would be applied to another person; and [¶]  3.  At the time the act was committed, the person committing the act had the present ability to apply physical force to the person of another"] and CALJIC No. 16.140 [the elements of battery are:  "1.  A person used force or violence upon the person of another; and [¶]  2.  The use was willful [and unlawful]"].)  Thus there was no evidence here that Alcantara aided and abetted any non criminal behavior that led as a natural and probable consequence to the homicide committed by Fisher.  (See *People v. Prieto* (2003) 30 Cal.4th 226, 252, 133 Cal.Rptr.2d 18, 66 P.3d 1123.)

We further reject Alcantara's argument that because the jury was not instructed on the misdemeanor crimes of assault and battery, the jury was "given insufficient instructions to find [Alcantara] guilty of aiding and abetting a crime that would have supported a verdict of involuntary manslaughter as to appellant."  Alcantara advances involuntary manslaughter under the theory that the killing took place "during the commission of an unlawful act not amounting to a felony which is dangerous to human life under the circumstances" under CALJIC No. 8.45.  In this case, the jury could only conclude Alcantara's actions of applying the stun gun to the victim's chest constituted a violation of Penal Code section 244.5, subdivision (b).  That section reads:  "Every person who

1    commits an assault upon the person of another with a stun gun or
     taser shall be punished by imprisonment in a county jail for a term
2    not exceeding one year, or by imprisonment in the state prison for
     16 months, two, or three years." Because this crime is considered a
3    felony for all purposes until sentencing  (*People v. Walker* (1969)
     272 Cal.App.2d 252, 254, 76 Cal.Rptr. 924), there was no
4    misdemeanor upon which a verdict of involuntary manslaughter
     could have been based.

5
     We, therefore, conclude there is no reasonable likelihood the trial
6    court's failure to instruct on these misdemeanor target offenses in
     this case "caused 'the jury to misapply the "natural and probable
7    consequences" doctrine' [citation], and no reasonable probability
     defendant would have obtained a more favorable outcome absent
8    the alleged instructional error [citation]." (*People v. Prieto, supra,*
     30 Cal.4th at p. 252, 133 Cal.Rptr.2d 18, 66 P.3d 1123.)
9

10   (People v. Fisher, et al., slip op. at 28-30.)

11          A petitioner has a particularly heavy burden to prove a due process violation on

12   the basis of a failure to give an instruction, as an "omission, or an incomplete instruction, is less

13   likely to be prejudicial than a misstatement of the law."  Henderson, 431 U.S. at 155.  The failure

14   to instruct on a theory of defense may constitute a violation of due process by depriving the

15   defendant of the right to present his case if substantial evidence was presented to support that

16   defense.  Bradley v. Duncan, 315 F.3d 1091, 1098-1100 (9th Cir. 2002).  However, while a

17   defendant is entitled to adequate instructions on the defense theory of the case (see Conde v.

18   Henry, 198 F.3d 734, 739 (9th Cir. 1999)), he is not entitled to have instructions prepared in his

19   precise terms where the other instructions given sufficiently embody the defense theory.  See

20   United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996).

21          Recently, in People v. Nero, 181 Cal.App.4th 504, 104 Cal.Rptr.3d 616 (Cal.App.

22   2 Dist. 2010), the California Court of Appeal for the Second District concluded that CALJIC No.

23   3.00, to the extent it suggests that an aider and abettor cannot be found guilty of a greater or

24   lesser offense than the actual perpetrator, is "confusing and should be modified."  Id. at 104

25   Cal.Rptr.3d 616.  However, in Nero, the jury asked whether it could find an aider and abettor

26   defendant guilty of a lesser crime than the direct perpetrator, and the court instructed the jury it

1  could not do so.  Further, the evidence was very much in dispute.  All those factors led the court

2  in Nero to hold that the error was prejudicial.  Nero, 181 Cal.App.4th at 519.

3          In the instant case, the jury did not ask such a question.  (CT 1012-16.)  None of

4  the jury questions indicated the jury was equivocating over the level of involvement as between

5  petitioner and Fisher.  (Id.)  In addition, the jury's questions revealed no confusion as to the

6  target crime.  (Id.)  The jury here was instructed on murder, voluntary manslaughter and

7  involuntary manslaughter.  If the jury believed the evidence supported a conviction of a lesser

8  crime, there were sufficient instructions to provide for such a verdict.  The jury chose to convict

9  petitioner of second degree murder.

10         Moreover, even assuming instructional error occurred based on the "equally

11 guilty" language of CALJIC No. 3.00, the error was harmless because the evidence did not

12 support a finding that petitioner was guilty of a lesser offense than murder.  Solis v. Garcia, 219

13 F.3d 922 (9th Cir. 2000) (despite omission of target offense elements, no constitutional violation

14 because there was no evidence Solis aided and abetted any noncriminal behavior which led, as a

15 natural and probable consequence, to murder.)  While there may exist cases, like the situation in

16 Nero, supra, in which it would be error to prohibit the jurors from finding that the aider and

17 abettor was guilty of a lesser crime than the direct perpetrator, this was not such a case.  As

18 discussed in the analysis of petitioner's insufficient evidence claim, the prosecution presented

19 sufficient evidence to prove that petitioner aided and abetted an assault, battery, and assault with

20 a deadly weapon.  Petitioner participated in the crime, along with Fisher, by first using a stun gun

21 on the victim.  Under the natural and probable consequences doctrine, it was reasonably

22 foreseeable that the use of a stun gun on a conflicting gang member, in the presence of fellow

23 gang members, would result in the victim's death.  On these facts, the court finds that CALJIC

24 No. 3.00 did not violate petitioner's right to a fair trial because, given the evidence supporting the

25 second degree murder conviction pursuant to the natural and probable consequences theory, it

26 cannot be said that the instruction caused any substantial or injurious influence on the verdict.

1  Brecht, 507 U.S. at 637.

2        For the foregoing reasons, the state court's rejection of this claim was not contrary

3  to, nor did it involve an unreasonable application of, clearly established federal law as

4  determined by the United States Supreme Court.  Accordingly, this claim should be denied.

5                    iii.  Terminating Aiding and Abetting Liability

6        Petitioner contends jury instruction CALJIC No. 3.03 violated his right to due

7  process because it impermissibly suggested petitioner was guilty of murder for failing to stop

8  Fisher from stabbing Ramirez, whether or not murder was a natural and probable consequence of

9  the target crime of assault with a stun gun.  Respondent argues it is unlikely the jury interpreted

10  CALJIC No. 3.03 in that way.

11        The last reasoned rejection of this claim is the decision of the California Court of

12  Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

13  this claim as follows:

14        Alcantara argues the trial court impermissibly instructed the
      jurors "over defense objection, on the termination of liability of
15      one who aids and abets, as the instruction was factually inapposite
      and suggested [Alcantara's] guilt of murder if he did not try to
16      prevent its commission."  The trial court did not err.

17        The trial court instructed the jury with CALJIC No. 3.03 as
      follows:  "Before the commission of the crimes charged in Count
18      1, murder, or any lesser offense to Count 1, an aider and abettor
      may withdraw from participation in those crimes, and thus avoid
19      responsibility for those crimes, by doing two things:  First, he must
      notify the other principals known to him of his intention to
20      withdraw from the commission of those crimes; second, he must
      do everything in his power to prevent its commission."  This is a
21      correct statement of the law.  (People v. Norton (1958) 161
      Cal.App.2d 399, 403, 327 P.2d 87.)
22
        "The trial court has the duty to instruct on general principles of
23      law relevant to the issues raised by the evidence [citations] and has
      the correlative duty 'to refrain from instructing on principles of law
24      which not only are irrelevant to the issues raised by the evidence
      but also have the effect of confusing the jury or relieving it from
25      making findings on relevant issues.'  [Citation.]"  (People v.
      Saddler (1979) 24 Cal.3d 671, 681, 156 Cal.Rptr. 871, 597 P.2d
26      130.)

1      We do not accept Alcantara's contention that this instruction
2  "confused the issue of aiding and abetting and unfairly supported
   the notion that [Alcantara] realized that Fisher would stab [Carlos]
   Ramirez and could have done something to stop him."  It simply
3  and correctly informed the jury as to how an aider and abettor may
   terminate his liability for crimes committed by his or her
4  coconspirators.  As the trial court correctly indicated during the
   jury instruction conference, CALJIC No. 3.03 was not irrelevant in
5  light of Alcantara's contention that Sanchez was an accomplice to
   the crimes.  The simple fact that Sanchez stayed by the car and did
6  not participate did not relieve him of his potential liability as an
   accomplice to this crime and the potential need for corroboration of
7  his testimony.  Further, given that aiding and abetting was a central
   issue in this case, it was entirely logical and relevant for the trial
8  court to instruct the jury on how a coconspirator could terminate
   his liability.  Indeed, it was the People's argument that no party had
9  withdrawn from this conduct when Fisher stabbed Carlos Ramirez.

10  (People v. Fisher, et al., slip op. at 30-32.)

11           Even if there is some ambiguity, inconsistency, or deficiency in the instruction,

12  such an error does not necessarily constitute a due process violation.  Waddington v. Sarausad,

13  129 S.Ct. 823, 831 (2009) (citation omitted).  Rather, the petitioner must show both that the

14  instruction was ambiguous and that there was "a reasonable likelihood" that the jury applied the

15  instruction in a way that relieved the state of its burden of proving every element of the crime

16  beyond a reasonable doubt.  Id. (citing Estelle, 502 U.S. at 72).  In making this determination, the

17  jury instruction "may not be judged in artificial isolation, but must be considered in the context

18  of the instructions as a whole and the trial record."  Id. (quoting Cupp v. Naughten, 414 U.S. at

19  147).  "The pertinent question is 'whether the ailing instruction by itself so infected the entire

20  trial that the resulting conviction violates due process.'"  Id. (quoting Cupp, 414 U.S. at 147).

21  Therefore, in order to establish a due process violation, petitioner is still required to demonstrate

22  a "reasonable likelihood" that the jury applied the instruction in a way that relieved the state of

23  proving every element of the crime beyond a reasonable doubt.  Waddington, 129 S.Ct. at 831.

24  A "reasonable likelihood" is lower than the "more likely than not" standard but higher than a

25  mere "possibility."  Polk v. Sandoval, 503 F.3d 903, 910 (9th Cir. 2007).

26           A determination that there is a reasonable likelihood that the jury has applied the

1  challenged instruction in a way that violates the Constitution establishes only that an error has

2  occurred.  See Calderon v. Coleman, 525 U.S. 141, 146 (1998).  If an error is found, the court

3  also must determine that the error had a substantial and injurious effect or influence in

4  determining the jury's verdict, see Brecht, 507 U.S. at 637, before granting relief in habeas

5  proceedings.  See Calderon, 525 U.S. at 146-47.

6          Considering the instructions as a whole, the court cannot say that there was a

7  reasonable likelihood that the jury applied the challenged instruction in a way that violates the

8  Constitution.  The trial court instructed the jury as to the elements of murder, the lesser-included

9  offenses of voluntary and involuntary manslaughter, and the doctrine of natural and probable

10  consequences for aider and abetter liability.  The trial court properly instructed the jury on aiding

11  and abetting (CALJIC 3.00, 3.01, 3.02) (CT 631-34.)  The trial court also instructed the jury

12  using CALJIC 3.03:

> Before the commission of the crimes charged in Count 1, Murder,
> or any lesser offense to Count 1, an aider and abetter may withdraw
> from participation in those crimes, and thus avoid responsibility for
> those crimes by doing two things:  First, he must notify the other
> principals known to him of his intention to withdraw from the
> commission of those crimes; second, he must do everything in his
> power to prevent its commission.

17  (CT 635.)  The state court found this instruction correctly defined California law.  This finding is

18  binding on this court on habeas review.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

19          CALJIC 3.03, when read together with the other instructions, clarifies for the jury

20  how a defendant could terminate his liability.  This instruction does not mislead the jury into

21  believing an aider and abettor is liable for all crimes committed by the principal simply because

22  the aider failed to prevent those crimes.

23          As noted by respondent, the prosecution explained terminating liability by

24  offering the following example:

> And using your stun gun and your buddy comes up . . . and helps
> you out and you see what he's doing, you don't stop him and you
> continue to swing your stun gun, you're in it and the law says

1    you're equally responsible.

2    (RT 3191.)  This argument reinforced the actual meaning of CALJIC 3.03.

3    In light of the above, the state court's rejection of petitioner's challenge to

4    CALJIC 3.03 was neither contrary to, nor an unreasonable application of, controlling principles

5    of United States Supreme Court precedent.  Therefore, this claim should also be denied.

6    iv.  Cumulative Error

7    Petitioner's last claim is that the alleged jury instruction errors worked together to

8    cumulatively constitute a denial of due process.

9    The last reasoned rejection of this claim is the modified decision of the California

10   Court of Appeal for the Third Appellate District following petitioner's petition for rehearing.

11   (LD 6.)  The state court addressed this claim as follows:

12   Finally, [petitioner] claims cumulative error requires reversal.  As
       discussed above, we have concluded there was no prejudicial error
13   with respect to the instructions given.  We further conclude the
       combined errors in the two instructions concerning accomplice
14   liability do not constitute cumulative error.

15   (LD 6 at 5.)

16   The Ninth Circuit has concluded that under clearly established United States

17   Supreme Court precedent the combined effect of multiple trial errors may give rise to a due

18   process violation if it renders a trial fundamentally unfair, even where each error considered

19   individually would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007)

20   (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974), and Chambers v. Mississippi, 410

21   U.S. 284, 290 (1973)).  "The fundamental question in determining whether the combined effect

22   of trial errors violated a defendant's due process rights is whether the errors rendered the criminal

23   defense 'far less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and

24   injurious effect or influence' on the jury's verdict."  Parle, 505 F.3d at 927 (quoting Brecht, 507

25   U.S. at 637); see also Hein v. Sullivan, 2010 WL 1427588, *15 (9th Cir. 2010) (same).

26   This court has addressed each of petitioner's claims and has concluded that no

34

1  error of constitutional magnitude occurred.  This court also concludes that the alleged errors,

2  even when considered together, did not render petitioner's defense "far less persuasive," nor did

3  they have a "substantial and injurious effect or influence on the jury's verdict."  In the instant

4  action, the jury asked several questions, none of which related to finding petitioner guilty of a

5  lesser included offense, the termination of aider and abettor liability, or the proper application of

6  the natural and probable consequence doctrine.  Rather, the jury requested read back of Sanchez'

7  testimony.  (CT 1012-14.)  The jury inquired whether separate verdicts were required for counts

8  one and two, and whether separate verdicts were required regarding California Penal Code §

9  186.22 subdivisions (a) and (b).  (CT 1015.)  Finally, the jury asked for a definition of street

10  terrorism.  (CT 1016.)

11      Moreover, the prosecution presented two alternative theories to convict petitioner

12  of second degree murder:  first, petitioner and Fisher intentionally attacked Ramirez with the

13  intent to kill; or second, Ramirez' death was the natural and probable consequences of the stun-

14  gun attack initiated by petitioner.  (RT 3117-32; 631-34.)  Based on the evidence adduced at trial,

15  the jury could reasonably have convicted petitioner under either theory.

16      Accordingly, petitioner is not entitled to relief on his claim of cumulative error.

17  VI.  Conclusion

18      For all of the above reasons, the undersigned recommends that petitioner's

19  application for a writ of habeas corpus be denied.  If petitioner files objections, he shall also

20  address whether a certificate of appealability should issue and, if so, why and as to which issues.

21  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a

22  substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

23      Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

24  a writ of habeas corpus be denied.

25      These findings and recommendations are submitted to the United States District

26  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

one days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

objections shall be filed and served within fourteen days after service of the objections.  The

parties are advised that failure to file objections within the specified time may waive the right to

appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 7, 2010

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

alca1700.157